We'll hear Cement League v. the NLRB. May it please the court, Andrew Roth for Petitioner, New York City District Council. I have reserved three minutes of my time for rebuttal. Thank you. I'd like to start out with the Supreme Court decision in the Allentown Max Sales v. NLRB case, which is cited and relied on at page 24 of our opening brief, 522 U.S. 359. That sets the standard of review in this board case, and what the Supreme Court said in that case was that board adjudication is subject to the requirement of reasoned decision-making. Under that requirement, what the court said in that case was not only must the decreed result be within the lawful authority of the board, the reasons that the board gives for reaching that decreed result must be logical and rational. What that means in this case is while it's certainly within the board's lawful . . . Have you conceded that there was a violation of the act here? We didn't concede it, but we . . . like affirmatively conceded it, but it was not contested at the board level. So we are . . . But you conceded. Effectively conceded that there was a violation, but argued that the violation was of no harm to actually the people who were complaining about the . . . When you made that concession, exactly what did you have in mind? What conduct violated the act? I was not counsel at the board level, so I didn't have anything in particular in mind, but . . . What does the record reflect? I mean, there was no argument made, so I don't think the record really reflects any thinking on behalf of . . . I think the CBA, which has a one-on-one, one-to-one provision and requires that the district counsel be that . . . in effect, that the union as to who it favors, that's the claim, right? That that is a violation because it favors one union over another. Yes, and that's why we say it's a technical violation because . . . How technical is it? I mean, you know, people had to quit the other one. The Northeast Union lost members, the other side gained members, and if people shifted over to that union because they felt they had to if they were going to get work, they would forfeit their pensions in the prior fund. Well, they might . . . If they had less than five years, they would have . . . Yes. But they would move on to the pension plan . . . They would move on, but they couldn't carry it forward. Yes, but that's not what . . . I mean, the allegation here was an infringement of . . . It wasn't just nominal a problem. No, no, but the Act, and we addressed this in our brief, Section 7, and this Court has said this, and the ALJ actually said this in his decision here, the core of Section 7 is not, you know, preventing people from having to move from one local of an international to another. It's really the fundamental choice between am I going to be a union member or am I going to be a non-union member? And this case doesn't . . . Excuse me. There were cases that actually refined that further and said that when you're forcing a person to join one union rather than another, it could be a violation, and I thought that the NLRB was taking that position. No, the NLRB . . . There are a couple of cases, they've cited two. One was actually properly cited because the other was a two-member board decision which was not valid under Supreme Court authority, but they cited one decision in which somebody was turned down, lost a job opportunity because they were a member of a carpenter's local from outside of the jurisdiction, and there was a local preference given to carpenter members from the local within that jurisdiction. So there was an actual loss to that member of . . . And that's what, as this Court said in, I forget the name of the case, but it was Judge Kearse's opinion which we relied on, that at its core, what Section 7 protects is you don't lose work because you refuse to be a union member. Those job opportunities have to be made . . . The irony of this case is, and the one-to-one matching can't be looked at in a vacuum, it replaced the system where you had to effectively hire from the out-of-work list. You couldn't just bring in whoever you wanted for the employer, so there's always been a channeling of work to the out-of-work list, which is comprised predominantly of local members of the carpenters. The irony here is that under the prior regime, which was a 50-50 or a 67-33 split, all these people could not . . . Only half the crew could be brought to the job. Under the one-to-one matching, by transferring their membership, they actually got work that they would not have been able to get under the prior regime that this replaced. That's the way it's not only really a de minimis violation. It's almost a violation that didn't do any harm and did affirmative good on balance. There was the pension element, but there was no showing that anybody actually lost out on vested pension rights. What the showing was was that a full crew of this one employer's workers was able to get work under this new requirement that half that crew would not have been able to get under the prior . . . union to join a different one. Correct. Our point . . . I'm saying that doesn't matter. No. I don't say that doesn't matter. I say that doesn't . . . It's a de minimis harm. I'm saying after they did it, they were happy. Not only were they happy, from an economic standpoint, they were much better off. Right. That's why they had the incentive to move from one to the other. The universe of people we're dealing with, as far as the workers are concerned, are carpenters. Correct. All of these . . . We're dealing with carpenters' unions under the ambit of the international. Yes. Help me understand why that's something that Section 7 reaches in the first instance. Section 7, as I read it, is directed at restrictions on employment predicated on, before you come to me to be a . . . Don't come to me and talk about getting hired unless you're a carpenter. You can't do that. Conversely, more . . . All of these . . . Usually, it's employers want to discriminate you because you are a union member. They don't want somebody organizing within their workplace. I think . . . This is an intramural dispute between locals. That's exactly right. I think for . . . Why does Section 7 reach that? I don't think it does. We argue in our brief it doesn't. We did waive the argument by not contesting the violation. It is an uncontested violation. Certainly, for whatever strategic reasons, the decision was made at the board level to say that whether this is a violation or not, to strike this down and do what the board is really basically saying here is to go back to a regime, a non-full mobility regime, where there are similar restrictions on . . . Actually, broader restrictions on the number of out-of-town people that can come. The intervener says, well, you don't have to do that. You can just have a local preference. That's totally lawful. That would kill their members. This was a compromise, I think, the collective bargaining compromise that not only . . . I don't think there is a violation of Section 7, but at best, it's a highly technical one. For the board to come in and take cognizance of that in the face of the damage that striking down this provision . . . That was what we chose to put our eggs in that basket. Why I come back to the reasoned decision-making requirement is, what did the board say? The board didn't address that at all. It said, well, there is no damage. One, full mobility is not an anti-corruption mechanism. Full mobility is the right under the new contract for employers to hire anybody they want. It's not an anti-corruption mechanism. It's a privilege to the contractors. That's absolutely right, but that doesn't address . . . We put on a very strong case at a hearing. We put on the lead negotiator for the union, who explained in chapter and verse what the anti-corruption benefit of the one-to-one matching exception to full mobility is. We put on the independent monitor, who the court has charged with oversight over the union. We didn't put him on, actually. He was allowed to make a statement to the ALJ, so he wasn't under oath. The board didn't say he wasn't credible. The board didn't address that testimony. It didn't address his statement at all. There are two things at play here. One, you've got a consent decree and Judge Berman is supervising it and so forth. Then you've got the board coming in and doing what it did here.  It would have to be a renegotiation of the collective bargaining agreement because the terms would be different. It would absolutely have to be a . . . Not only in the cement league case, this is a pattern agreement. Let me ask you this. Was the board involved at all in Judge Berman's consideration of the collective bargaining agreement when he approved it the first time? No. That's one of the points the board made, that Judge Berman . . . It wasn't argued to him that this could be a . . . Nobody argued to him on one side or the other. That there would be a violation. Right. Nobody thought about it. That's really neither here nor there. I know that. I'm just trying to think of a practical . . . It's very much here and it's very much there because I don't see how the . . . I understand this case comes directly to us, but it seems to me Judge Berman has a lot of skin in this game. He approved a . . . Provisions of a collective bargaining agreement that were designed to control corruption. Here's the NLRB overruling Judge Berman. That's a procedure that I'm not familiar with. It's worse than that, Your Honor. It's not only overruling him. It's really not taking cognizance of what . . . I'm just saying it's a technical violation. It's within our precedent. That's why I come back to the Supreme Court's decision. You've got to have a rational reason for doing something. For us, as it stands before us, we're supposed to enforce this order. Is that right? Well, there's . . . We petitioned for review and asked the court to strike it down. The board has crossed petition to enforce it. We're saying an enforcement would be . . . We're trying to enforce and require the board to go before Judge Berman to make its points. Without saying it, we would strike it down, but we just declined to enforce it at this stage, subject to your coming back, but sent the board over to Judge Berman to make the same arguments that they're making now before Judge Berman so that this thing can be resolved. We don't have a procedure that I know of to remand the case to Judge Berman because it didn't come from Judge Berman. It came from the board. Here's the practical reality, Your Honor, and I've thought a lot about this. There is no mechanism. That would obviously be a common sense result. I don't know the mechanism. I will say this. If the board strikes this down, these contracts . . . not the cement league contract, but the other three contracts that the cement league is patterned on are all coming up for renegotiation this summer. I think if the court were to say in its opinion, we're striking this down, but we'd like Judge Berman to, in the context of this renegotiation, to comment on whether this is . . . it would be an unusual procedure, but I'm sure Judge Berman, as the overseer of the consent decree, would be more than happy . . . In effect . . . Make a new law. Well, maybe. I'll just worry about that. Somehow get it before Judge Berman before we make a final decision. I think if the court asked for Judge Berman to take cognizance of these issues in the process of the new contracts, I'm sure he would oblige the court. No, but I'm wondering . . . that wouldn't necessarily dispose of our case. The thought I . . . No, I think if . . . because if Judge Berman were hypothetically to say, I can live without the one-to-one, I don't think it serves that much of an anti-corruption, then a new . . . the board could strike it down, but the board always has the authority to come back on a new complaint. If it continued to be enforced under a new contract, if the parties re-upped it, continued to be enforced by the parties, and Judge Berman were to say, well, this is not really . . . I don't regard this as central. Conversely, if he said, I do regard this as central, then presumably we would hope the board would not proceed on a further complaint by the Northeast Council, and that would be the end of it. That's what . . . that's why I think I would probably shake out in practice. Thank you. Were there . . . does the court have further questions? No. You've reserved for some rebuttal. We will hear you then. Good morning. Good morning. My name is Michael Salgo. I'm the Executive Director of the Cement League. My members are the leading cement and concrete superstructure contractors in New York City. One of the unions that we negotiate with on a multi-employer basis is the District Council of Carpenters. I'd like to join in . . . first, I appreciate the court giving me the time, and I would like to join in Mr. Roth's arguments pertaining to the legal reasons for denying enforcements, but I would also like to talk about the practical effects of a grant or a non-denial. So, my members work with 150, 200 workers, a composite crew. They collectively bargain. They negotiate hard-fought contracts. They get contracts, sometimes a year or more in advance, and some of their contracts last for a year or more. Unraveling this could do significant economic harm to my members and to the unionized industry. If we strike this CBA down, it's not a typical . . . my current CBA, not the one that was . . . the new one . . . Judge Berman just approved . . . Judge Berman approved? I'm not sure that Judge Berman had to approve it because it didn't impact . . . Let's be very clear about what CBAs we're talking about. I thought there was a 2015 CBA that was the latest one that had the one-on-one . . . I'm not on the same schedule as the others. The Cement League is not in the same schedule. That contract, the 2013, that established the one-to-one, expired for my association on June 30th, 2015. The union went on strike. We had injunctions by this court. After about seven or eight months, we extracted significant economic concessions in order to . . . for my workers to go . . . for my contractors to go forward. It's those significant reductions that this court would set aside. We're not in an environment where you say, well, if we set aside this contract, you fall back to a lower rate, which is typical. I would fall back to a higher rate. We have . . . we're in a death fight with non-union contractors. The competition is severe. We extracted these concessions. The point I wanted to make, and hope I am making to this court, is that there are very real consequences to this action, which seems like an internecine fight between two locals of the same union. What I see is a small battle where no one has ever articulated an injury, and no one's ever asked for a dime of damages, which caused millions of dollars of damages to my client. My . . . I should say, not my clients, but my members. Thank you. May it please the Court, I'm Kyle DeCant on behalf of the National Labor Relations Board. There is no dispute in this case that the Petitioner's Collective Bargaining Agreement violated Section 8A.1 by imposing preferential hiring based on membership in the New York City Council. I'm talking about Judge Berman's Collective Bargaining Agreement, aren't you? Because he, under the Consent Decree, approved it. He did approve it, but . . . Your Honor, the Petitioner's burden is to demonstrate that there's a conflict between Section 8A.1 and the anti-corruption purposes of . . . That doesn't really solve any problems for our society or for the relations that exist here in terms of between these two unions, and also the Collective Bargaining Agreement and the purposes of the Collective Bargaining Agreement, which were . . . and the provisions in there to deal with corruption, and all of the matters, the widespread matters that Judge Berman had to deal with, and that's the elephant in the room, the case before Judge Berman and his continuing to monitor. I don't see why we should enforce this agreement, the finding that the Board made, if it's going to, in effect, cause a lot of harm that we don't know about, because we weren't there. We don't have the dynamics of Judge Berman's litigation before us. Your Honor, when Judge Berman approved the agreement, he never mentioned the full-mobility hiring provisions as benefiting the anti-corruption purpose. That's fine. I'd like to hear that from him. How about that? But in his Consent Decree, he never mentions it. He mentions the . . . Why don't we just send it to Judge Berman, hold the case in abeyance, and ask Judge Berman to comment on this, and to take jurisdiction over this issue if he wants to do it, and you can make your arguments to Judge Berman, because otherwise, we're going to be throwing a monkey wrench into a collective bargaining agreement, if we agree with you, that, in effect, could upset . . . I don't know, it might not, but it could possibly upset the carefully balanced work of Judge Berman and the parties in coming up with a collective bargaining agreement. Follow me? I mean, it's . . . we have to . . . there's a little common sense here, not just blindly following the fact that there's a violation and it's been conceded, and then just rubber-stamping it with an enforcement, because we don't know what the consequences of that will be. I understand, Your Honor, but when Judge Berman did approve the collective bargaining agreement, he listed four anti-corruption mechanisms. He wasn't focused on this. He wasn't focused on this problem. We know that. It's pretty clear that nobody raised it, nobody discussed it. This is coming in . . . this is sort of blind-sighted, coming in from the . . . collaterally, into Judge . . . into the picture that Judge Berman had before him. But Your Honor, that's because the full-mobility hiring provisions had no anti-corruption purpose. In fact, wherever corruption's found . . . You can't read his mind. You don't know what he was . . . what he would say if the concerns he expressed were rehearsed before him. That's presumptuous. No, Your Honor, because he listed his reasons for approving the collective bargaining agreement in accordance with the anti-corruption purposes, and the full-mobility hiring provisions were not one of the anti-corruption purposes. In fact, wherever corruption is found among a cement-lead contractor, those provisions are scrapped. And furthermore, the parties are equally free to . . . Is there a U.S. trustee in this case? I believe there is, Your Honor, but I don't know off the top of my head. Wasn't there a . . . the U.S. Attorney's Office for the Southern District was initially involved in this case. Is that correct? I believe so, Your Honor. And isn't there . . . is there a trustee, a RICO trustee, in place here? I believe so, but I don't know off the top of my head, Your Honor. If so, shouldn't we be hearing from the RICO trustee? I think I could be wrong, but I thought the record reflected that such person exists and was in place. I believe someone on behalf of that testified to the Board, and the Board found accordingly that the full-mobility hiring provisions weren't a part of the anti-corruption purposes of the district court's approval of the collective bargaining agreement. In fact, what you're asking, what this would do would be to strike a provision of the collective bargaining agreement, correct? Is it valid? That's correct, Your Honor. And then, when that's done on the outside, then doesn't that require a renegotiation of the agreement because one of the terms is gone? I mean, you know, you start extracting provisions from agreements that, you know, were part of the bargain. Then there'd have to be a renegotiation, right? That would follow, Your Honor. However, as the administrative law judge's decision notes, Article 19 of the collective bargaining agreement does state that if the full-mobility hiring provision is voided, then the parties would return to the 50-50 hiring standard where the cement league contractors would select 50% of the employees and the other 50% would be selected from the out-of-work list on a first-listed, first-hired basis. So this matter was already contemplated by the parties, Your Honor. How does this full-mobility provision harm carpenters? Your Honor, the full-mobility exists only to the extent that the contractor hires a member of the New York City Council. And whenever they hire someone who's outside the New York City Council, they have to match one-for-one from the out-of-work list. I understand that, but if anybody can join the New York and vicinity council, right? So how does it harm a carpenter? Your Honor, it's a straightforward violation of the act to hire someone based on membership in this way. That may be, but I'm asking you a different question. I mean, I know how it harms a union, but I'm wondering how it harms a carpenter. I presume that's what this is all about. Your Honor, there's records showing that it forces members of the Northeast Council to choose between vesting in their pensions and health benefits versus getting a job. But it's also worth noting that those arguments were never raised to the board, so they're barred by Section 10e of the act. And so when the district court reviewed these hiring provisions, nothing in its orders even acknowledged that these full-mobility hiring provisions serve an anti-corruption purpose. So you're saying that when a carpenter decides to abandon the Northeast Regional Council carpenters and join the New York and vicinity district council, that person may lose their pension rights? There was some record to the effect of— I'm just asking. I don't know what the record is. Yes, Your Honor, that's true. But again, the question of damages was never raised before the board. It was already conceded. So that argument is barred by Section 10e of the National Labor Relations Act. That there's already a violation of the law, and that is totally uncontested. And the petitioners have not met their burden of showing that these full-mobility hiring provisions serve an anti-corruption purpose when, first of all, they're scrapped whenever corruption is found. And second of all, the parties can just as easily move to another standard like the 50-50 or the 67-33. They're scrapped whenever corruption is found. What kind of corruption are we talking about? That would be corruption in wages, benefits, or hiring, Your Honor. And those were the purposes for which this consent decree was existing. And when it found that, there was bad faith— It sounds like this is all bound up with the consent decree. No, Your Honor, because the full-mobility hiring provision is not itself an anti-corruption purpose. And the parties could just as easily replace that with the 67-33 that the district court had previously allowed, or the 50-50 that the district court had previously allowed. So there is nothing essential to the full-mobility. You said it's scrapped whenever there's a finding that it becomes an instrument of corruption. Yes, Your Honor, thus indicating that the full-mobility provisions don't prevent— So it can become an instrument of corruption, correct? Well, there's nothing about it that prevents corruption. It's simply removed whenever corruption is found, which is why the board noted that this is a privilege that can be taken away. Why do— Suppose we agreed with you that there was a violation, but before we enforce it, we, in effect, find a way to get this case back before Judge Berman so that he can take appropriate steps and accommodate that we made a finding that there was an actual violation, which is apparently uncontested, then he could take that into account, and there could be—he could ask the parties to renegotiate the agreement so that there wouldn't be a violation. The board never contemplated that in its decision and order, but certainly that's a possible— It's a possibility. Yes, Your Honor. Okay. Thank you. Okay. Thank you, Your Honors. May I please the Court, Your Honors? My name is Ray Heinemann. I represent the Northeast Regional Council. I want to shift gears to start off by saying this is not purely an internecine, intermural competition. There are important interests at stake. A bedrock principle of the National Labor Relations Act is that attractive employment opportunities cannot be conditioned on membership. In our industry, the hiring halls, hiring practices, that has always revolved around one problem, the problem of the traveler. The traveler comes into a territory, and this Court actually recognized that issue in the one ceiling case. They noticed that the 50-50 provision was called the out-of-towner matching requirement. The law has always been very simple. You cannot penalize a traveler coming into a territory. You can't require them to be a member to get employment benefits. They have to be treated equally. The vice of this provision is when a traveler, a Northeast Regional Council member, comes in with their employer, the employer says to them, I can't keep you, otherwise I got to take a member from the hall. I don't want to do that. You have to change your membership. Why do we care? First, contrary to the National Labor Relations Act, that individual, and there have been over 250 of them, is placed to make a choice. Keep your job or give up your union membership. But whether he travels or stays at home, he's still a carpenter. He can stay at home and work, but there's no employment opportunities at home. He's traveling to get those employment opportunities. He should be getting employment opportunities regardless of union membership. What you're saying is full mobility requires the mobility of the contractor to bring his workers, his regular workers, with him. Correct. So that, and this interferes with that. The problem is, to get full mobility, they all have to be District Council members. And there's movement back and forth. So, and that's never played a role. Now, the problem I have, though, is we're acting like this is some cute little button you wear on your lapel, but it's not. There are five things at issue. Every time a member is asked to make this choice, five things are at stake. If they're a carpenter with less than five years, in order to keep their job, they have to give up their vesting in the Northeast Regional Council pension fund. If they're a senior carpenter, they're within ten years of retirement, they've put in their life working for this employer, they have to give up their retiree health benefits when they switch to the New York City District Council. Number three, when they switch to the New York City District Council, they have to work 10, 15, or more years to get retiree health benefits under their new union. Health benefits, when they give up their membership, at the end of the month they give up their membership, they give up their health benefits. It takes them a full calendar quarter to get new benefits. And finally, and let's be clear, these men and women were all told, give up your membership or give up your job. Now, it's conceded, they gave up their jobs. And there's a whole reason for that, if you look at the case history, there were some charges going back and forth. But that requirement, give up your benefits, give up your membership, keep your job, since the inception of the National Labor Relations Act has been the key component. Now, Judge Berman was never told any of this. Well, we want to act like he didn't know. He wasn't told. He had experienced practitioners who should have known if they didn't know that this was a violation. I take it you weren't represented before Judge Berman? I have never been before Judge Berman. I mean, your client wasn't represented. Correct. No, we're the Northeast Council. We are not under supervision by Judge Berman. I see. So what's wrong with our taking this case, acknowledging the concession that was made as far as the violation was concerned, and then, but before we enforce it, asking the parties to go before Judge Berman to bring this to his attention for whatever steps he thinks is appropriate? Your Honor, if you look at the District Council docket before Judge Berman, this has been sitting with his attention for . . . I thought you said none of this was brought to his attention. It was not brought to his attention at the time this collective bargaining agreement was entered into. That's right. When he was, as the district court says, he's not supposed to make . . . I'm sorry, as the circuit court said in Wall and Ceiling, he's not supposed to make decisions on whether things are a good idea or not. His job is, was it democratically done? Is it going to spark corruption? Now he's approved a collective bargaining agreement that the board says is in violation of the Labor Act. Correct. So don't you think that that would be of some interest to him? Your Honor, my problem, though, is he approved this agreement in 2013. The charge was put in. The charge has been pending now, I think it's been over two years. This has been actively discussed on Judge Berman's docket for over two years. There have been contracts negotiated, the other pattern agreements. This agreement renegotiated, everyone knowing, including Judge Berman, that this charge was pending and able to say, Judge Berman, can you consider that this, what you're approving, violates the National Labor Relations Act? It wasn't done. We're still pending. This Court remanded to Judge Berman the two-man rule. Back in the summer, it's still pending. A brief was just filed about a month ago dealing with this issue. The problem I have is this Court has already said the whole idea of filmmobility has nothing to do with anti-corruption. You said that at page 615 of your prior decision with the wall and ceiling. This Court said the order says very little about the merits of filmmobility and states that the most important factor in the district court's decision was the fact that the CBA is a bargained-over agreement that was approved by the lawfully designated representatives with the authority to approve collective bargaining agreements at 620. You've also said Judge Berman isn't supposed to decide if things are a good idea. He's supposed to decide was it democratic, was it corrupt, or does it remedy corruption. How about deciding whether or not it violates the Labor Relations Act? Your Honor, the job of the district courts is not to decide whether things violate the National Labor Relations Act. That's up to the National Labor Relations Board, and I'm having a mental block. There's a very old case that says that. I apologize. The process should have been, Judge Berman should have been told straight up, this violates the National Labor Relations Act, or there should have been an effort to renegotiate it or to tell him that, and then he could decide what he wanted to do and we could join this problem. But I agree with you. It's like the elephant in the room, but it's not only been ignored here. I don't think it has actually here, but it's been ignored at the district court level. He wasn't told. He should have been. He's known about this for years. We've had contracts renegotiated. You heard 2015 or 2016, it was just renegotiated again. This is not some carefully devised solution. This is out-and-out discrimination against the National Labor Relations Act. It's not a carefully devised solution. There are plenty of mechanisms to get around this problem. They've been cited to you in your brief. They've been scoffed at. They're there. What do you say to the argument that we've all heard today that enforcing this order, given the fact that this is a pattern agreement and that a lot of arrangements have been altered over time on the basis of the present CBA, would plunge the industry into chaos? Your Honor, first, the National Labor Relations Act sets out the standard that Congress set. They adopted collective bargaining. The National Labor Relations Act doesn't exactly stop chaos. The question is if, yes. Your Honor, the very idea behind the National Labor Relations Act is to prescribe some rules, put the parties into the room, protect commerce, and come out with collective bargaining agreements that are consistent with the law. The parties absolutely should be able to figure out how to avoid chaos. All this collective bargaining agreement—I'm sorry. There is a contract coming up in three months. This one can be negotiated. We're talking a single provision in a contract. It sounds very dramatic that we're going to have chaos. The National Labor Relations Act was created, the system of collective bargaining, to solve chaos. That's why we have it. You put the parties in a room. You have a mediator if you need one. You have whatever you need, and you deal with it. These are not insoluble problems. Your paradigm overlooks, again, the elephant in the room, which is that this particular collective bargaining agreement depends for its validity with all of its provisions on the imprimatur of Judge Berman. According to this Court, Judge Berman's job is to look at the collective bargaining agreement, not to judge if it's a good idea, if it's valid, anything. Judge Berman's sole concept is, was it democratically ratified, and does it solve corruption? Now, my problem with the democratic ratification is they negotiate an unlawful agreement. They go to their members, and they said—it's in the record— because this will increase your ability to get jobs with cement link, wall and ceiling. Nonsense. It didn't increase their jobs. They were sold a bill of goods. All it did was had the employers switch people from one union into another, strip them of their benefits so they could keep their job. That's hardly democratic. Judge Berman wasn't even given the opportunity to recognize that back at this time. It was hidden from him. Now we're being asked, let's delay everything, and finally, after seven years— I'm sorry, 1917, after about two years, two and a half years— let's go back and ask him, what are we going to ask him? We're going to ask him if it's a good idea. That's not his role. The problem that I have, Your Honor, is there's not a conflict here between Judge Berman's role and the role of the National Labor Relations Act. Judge Berman did not say full mobility is needed to fight corruption. I don't even think anybody can say that Judge Berman's decision— You're operating under a little bit of a misapprehension. You're saying that if we follow the course that we've been talking about here of asking the parties to go back before Judge Berman, that's going to be like a black hole and the case will just drag on and on. I admit to that misapprehension. Let me just say, there's something that we use called a Jacobson remand when we're dealing from a remand from the district courts in a case that's before the district court. We can put a time limit on it, 60 days. It's got to be back here. We restore jurisdiction, 30 days, whatever. The parties can come in and ask for an extension. We keep a tight rein on it. We don't want to have this case on our docket forever while labor relations go on in New York in uncertain ways. By the same token, I think that there is a concern here about upsetting a collective bargaining agreement that's been approved by Judge Berman without any input before Judge Berman about this. Except, Your Honor, the remedy by- It's an illegal provision. It is an illegal provision. If I were Judge Berman, I'd be interested in that. All I can say, Your Honor, is when you look at the district court's docket, all that's on there is it's reported.  The trial is reported. Everything is reported. I don't think there is a conflict, though, because the board says, renegotiate this provision. Now they go back to Judge Berman. Perhaps they don't want to. Now Judge Berman says, I don't care if it's illegal. I'm upholding it. Or Judge Berman says, I'm not approving it. It's an illegal provision. Negotiate something else. Get a mediator in. Get everybody in. Negotiate something that's lawful. The parties still have to do it. Everything we're doing is talking about pushing it down the line. One of the ironies of this case is the district counsel filed- In terms of the ability of parties to negotiate the next agreement and to do so with knowledge of the landscape, when would the parties need to know the outcome of this particular appeal, this particular proceeding? Well, there's two answers to that. I know yesterday would be good, but- Well, part of my problem, Your Honor, is everybody's conceded all along that this is an illegal provision. No, I understand all of that. So they've been able to do that now for years, and they're not. So the board remedies it. There's a contract coming up, wall and ceiling. That's why I'm asking. June 30th, the parties can negotiate. This agreement- When does that agreement expire? June 30th, 2017. The other part is, under the National Labor Relations Act, the parties can sit and negotiate at any time. So you're not negotiating something that's going to expire in June of this year? No. The wall and ceiling contract, which you dealt with in your prior decision in June, is a three-year agreement. Mr. Salgo told you that it is on a different time cycle. It expires a year earlier than the cement league agreement. It expires June 30th this year. So the cement league carpenter's situation is a year later? Yes, Your Honor. That's the way I understand it. But the parties have the ability today to renegotiate an unlawful provision. It's done all the time. That's what the board's telling them to do. They have a choice. They can either go back to the old provision if they want or sit down and bargain. That's the beauty of collective bargaining. We all dismiss it. We ignore it. It's fading, perhaps, but that's the beauty. Representatives of the parties, of employers and unions, getting together, solving the problem. We have a problem here. Judge Berman, unfortunately . . . No doubt it's beautiful. . . . approved. Well, thank you, Your Honor. Thank you, sir. And we'll hear rebuttal now. Thank you, Your Honor. Thank you, Your Honors. Let me start out by addressing what the Northeast Council attorney had to say. In terms of this bedrock principle, the board decided one case. And that one case arose in the normal context where you had full mobility and one local was trying to prevent somebody under a full mobility regime from coming in. This arises under a much different setting. This wasn't a consent decree case. We have a consent decree here where there hasn't been a history of full mobility. There already was, for many, many years, a 50-50 split or 67-33 in more recent years. So you couldn't have free traveling in. I mean, you had to hire half for most of those years or a third from the district council out of work list. So these members actually . . . the irony of this setting is there's only . . . all that's happened is one employer sort of gamed the system here and asked its employees. It wasn't . . . they weren't losing jobs. This was a new job, and there was a clever employer who came to the union folks, and the union folks were advised, you know, you may not want to do this if you're losing your pension or you're losing . . . So, presumably, these people weren't losing. There was no evidence that these people actually lost any pension rights or actually lost any benefit rights. There was no evidence presented there. This is a case in search of a problem that doesn't exist and that could plunge the industry into chaos. So, you know, this notion that there's some bedrock . . . I'm a little confused on this. Just go back on the facts. The 50-50 and the 67-33, half of it had to come out, and then a third had to come out of work list, right? Yeah, correct. I didn't know that the out of work list was confined to district council members. I thought other . . . It is not, but in practical terms . . . You said it was. No, I did not. If I implied that, I apologize, but no. But it had the same effect because 99% of the people on the out of work list are carpenter members. It just sort of . . . That's the practical reality of the situation. So, I mean, this is really just a technical problem, and it surfaced with regard to one employer under four contracts that had been in effect for four years. I mean, this is really . . . Talk about throwing the baby out with the bathwater. And, you know, the Northeast Council says, well, there are plenty of mechanisms. We can just go back to the old economically disastrous regime. You know, the employers fought tooth and nail to get full mobility. They made one concession that, you know, if they're . . . You know, they can't just go ahead and bring a whole crew of people out from, you know, New Jersey or something. They have to match if they do that, and that was just as sort of a replacement mechanism for the out of work list, and so you would assure in all jobs that there was at least some decent complement of members who could, you know, take advantage of the membership oversight provisions that were put in as part of this whole package deal in 2013. So, I mean . . . So, they say, well, no, you don't have to go back to that economically disastrous. You can go . . . There are plenty of other mechanisms. You can have a local preference. Well, I mean, that would completely disadvantage his membership because under a local preference, his people are coming from New Jersey. My impression is we're getting into the odds and ends of negotiation of a CBA here, which is not really a department, and we're looking at an order and deciding whether to enforce it or not. Right, and I believe, Your Honor, I do . . . I think Judge Walker was exactly right. What the court needs to do here is apply some common sense. The board has not applied common sense. The board said this is . . . There's one case that shows that this is, you know, this is a violation of the National Labor Relations Act, so, you know, we're going to just come at . . . You know, we're going to undo an entire delicate compromise in this industry, force them to go back to an old economically disastrous regime in order to do what? In order to help out nobody who's been injured. I think . . . Your adversary said that carpenters get injured if they have to terminate their membership in one union in order to join another union, and there's some plausibility to the idea that if you have vested rights or you were working toward vested rights and you switch unions, you will . . . you can be, at least, disadvantaged. In that one respect, but by the same token . . . Well, I mean, pension is not a small respect. No, but it's sort of paternalistic to say that because this is opening up job opportunities. Switching the membership opens up job opportunities that will not be available if we go back what the board says. Oh, they're cavalier. Let's go back to the prior regime. Well, they'll have their pension rights, but they won't have these high-wage jobs on high-rise construction in New York City. That's labor policy, and for better or worse, that seems to be confided to the NLRB. Let me ask you one last question. If you were drafting the decretal paragraph of our opinion, what would you have it say? I would have it say that the board did not engage in reasoned decision-making here. The case that was before it was there was a conceded technical de minimis violation. The defense was you will wreak havoc on the anti-corruption benefits of this consent decree if you force the parties to go back or to adopt a new local preference. That was the defense, that you should not remedy this technical violation. The board did not give a reasoned response for saying, nuts, we're going to remedy it. The board was irrational. Therefore, its decision is struck down because it did not give a reasoned... I'll go back to that Supreme Court decision. The Supreme Court says you may have the lawful authority to do something, but you have to give good reasons for it. Again this morning, the board counsel stood up and said, here's the reason we decided to remedy this. It's a violation, a conceded violation. And the district court didn't say that the full mobility provisions have an anti-corruption benefit. That's exactly his words. We conceded that. It's an exception to full mobility that we're fighting about here. Thank you. Thank you. We'll hear rebuttal. No. Yes. No. There's no rebuttal. All right. Then we will reserve decision. And at this time, we will take Roll v. Girardi on submission. That's the last case on calendar. Please adjourn court. Court is adjourned.